IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JIMMY LEE BENSON,<br><br>                Petitioner,<br><br>     vs.<br><br>M. BITER, Warden, Kern Valley State Prison,<br><br>          Respondent. | No. 2:11-cv-00150-JKS<br><br>MEMORANDUM DECISION |

Jimmy Lee Benson, a state prisoner appearing *pro se*, filed a Petition for a Writ of Habeas Corpus under 28 U.S.C. § 2254.  Benson is currently in the custody of the California Department of Corrections and Rehabilitation, incarcerated at the Kern Valley State Prison.  Respondent has answered.  Benson has elected to proceed without a reply.

### I.  BACKGROUND/PRIOR PROCEEDINGS

A San Joaquin County Superior Court jury found Benson guilty of murder (Cal. Penal Code § 187), three counts of attempted murder (Cal. Penal Code §§ 187/664), and participation in a street gang (Cal. Penal Code § 186.22(a)), as well as enhancements for personal and intentional discharge of a firearm during the commission of a felony, causing great bodily injury or death, participation in an offense where a principal personally and intentionally discharged a firearm, causing great bodily injury or death, and the commission of an offense to benefit a street gang, (Cal. Penal Code §§ 186.22 (b)(1), 190.2(a)(22), 12055.5(a), 12022.53(c)-(e)).  In March 2007, the trial court sentenced Benson to life in prison without the possibility of parole, plus four indeterminate terms of twenty-five years to life and a determinate term of forty-two years and four months.  The California Court of Appeal, Third Appellate District, affirmed Benson's

conviction and sentence in an unpublished decision,[1] and the California Supreme Court denied review on April 22, 2010.  Benson timely filed his Petition for relief in this Court on December 28, 2010.

The facts underlying Benson's conviction as summarized by the California Court of Appeal:

The evidence revealed the following:
The Party

Billy Ray Garner and his wife Tanya held a birthday party for their two teenage sons.  Since the Garners had previously resided in the Bay Area, some guests from the Bay Area attended.

The Garners' sons advertised the party with a flier circulated in Stockton, including at a mall and a local park.  The fliers announced an "ESO-EPA Party."  ESO [East Side Oakland] and EPA [East Palo Alto] are gangs and rivals of the North Side Gangster Crips.  [Benson] is a member of the North Side Gangster Crips.  The sons also invited friends from Oakland, Palo Alto, and Stockton.

The party took place in the Garners' backyard, complete with stereo speakers.  The host manned the gate and searched guests' backpacks prior to entry.  However, he frequently left his post to watch a televised boxing match.

The party progressed without incident until a rap song was played that encouraged people to call out their hometowns or neighborhoods.  Guests started yelling out towns, including East Oakland, East Palo Alto, and Stockton.  Other partygoers yelled "North Side Crip," "Gangster Crip," "NSGC," and expletives about Stockton.  The yells sparked tension among the partygoers.

The Garners decided to end the party, turned off the music, and asked the partygoers to leave.  Billy Ray Garner yelled loudly, "The party's over.  That's it.  The party's over."

As the guests began to leave, some partygoers from the Bay Area waited across the street for rides.  Other partygoers from Stockton "crip walked" in the street a few houses away.  A friend of Billy Ray Garner drove up and told him one of the boys in the street had a gun.  Garner saw someone with a gun and told his wife to call the police.  The gunman was in the group gathered down the street from the Garners' home.

Billy Ray Garner approached the man with the gun and said:  "Hey, man, you don't have to do this.  This is not that type of party.  You know.  I know what you guys are about.  These are high school kids.  You know, you don't have to do this, man."  The person with the gun said, "We hear you, OG."  Garner believed "OG"

---

[1] *People v. Benson*, No. C055253, 2010 WL 46681 (Cal. Ct. App. Jan. 7, 2010).

was short for "old gangster."  Garner later told police the man with the gun wore an Indianapolis Colts jacket.

According to Billy Ray Garner, [Benson] was among the group that included the person with the gun.  [Benson] said, "Fuck that nigger, he ain't nobody."  Garner testified:  "At that point I knew that I was in the wrong place.  [¶] . . . [¶] I started walking backwards."

**The Shooting**

Billy Ray Garner took about six steps backward and then turned around.  He saw his wife's friend and told her to run.  Suddenly Garner heard "a pop," and gunfire hit him in the arm.  He started running and then was shot in the back.  Garner's injuries resulted in a hospital stay and follow-up surgery.

Partygoers estimated six to nine shots were fired.  Fourteen-year-old Eric Castillo was struck in the head, foot, and stomach.  The head wound proved fatal, and Castillo was pronounced dead at the scene.

The Garners' 14-year-old daughter was hit by a bullet in the foot.  A 17-year-old partygoer was hit in the calf and a bullet grazed his nose.

Other bullets were fired into the Garner home.  These bullets were fired from the same weapon that killed Castillo.  Bullets found in the street had characteristics consistent with the bullet that killed Castillo.  Officers found evidence that at least 12 rounds were fired.

**The Aftermath**

Officers arrived to find about 120 hostile people either walking away from the Garners' house or in their driveway.  About a mile away, officers found Terrence Murray, who was wearing an Indianapolis Colts jersey.  Police detained Murray and four others:  David Lewis, Dawayne McDonald, Tim Moppins, and Danny Williams.  Gunshot residue was found on Lewis.

In nearby bushes, officers found a .22-caliber revolver with six spent bullets in the cylinder.  A prosecution expert could not determine if it had fired the bullet removed from Castillo.

**Defendant's Arrest and Interview**

Officers arrested [Benson] the day after the shooting.  A gunshot residue test found no residue.

Police Detectives Eduardo Rodgriquez and Youn Seraypheap interviewed [Benson] twice about the shooting.   The jury heard tape recordings of both interviews.

Initially, [Benson] told officers he did not have a gun and did not shoot anyone.  Gradually his story began to change.  Detective Rodriquez asked if [Benson] shot into the air, "Maybe just to scare everybody?  You're shaking your head up and down, is that yes?  Well you got to say it.  [¶] . . . [¶]  How many times did you shoot?  OK.  You have two fingers, is it two shots?"

Rodriquez asked what type of gun [Benson] had, and [Benson] stated he didn't know.  [Benson] also stated:  "[P]eople started shooting I just started shooting up to the air.  [¶] . . . [¶] . . . So they can get scared so they won't shoot me."  After the shooting [Benson] gave the gun to the "homie."  [Benson] later identified the gun

as a "44 Desert Eagle," which he shot "[t]wo times in the air." [Benson] denied having a revolver and said the Desert Eagle was an automatic. He also stated he picked up the two shells after the shooting and later threw them out the window while he was driving.

[Benson] told officers the .44-caliber Desert Eagle was in a friend's garage. Officers found the fully loaded gun in the garage. [Benson] also told officers three members of the group he was with, Lewis, Jesse Zamora, and Andy Thompson, fired guns.

**Dawayne McDonald**

Dawayne McDonald, one of the men detained with Terrence Murray, exercised his Fifth Amendment right against self-incrimination and refused to testify at trial. (U.S. Const., 5th Amend.) McDonald's preliminary hearing testimony was read to the jury. During the preliminary hearing, McDonald could not recall any details of the shooting at the party or any previous statements to police.

The prosecution then played for the jurors a videotape recording of a police interview of McDonald. McDonald told officers that partygoers from Oakland and Stockton clashed, yelling and passing out guns. McDonald stated [Benson], along with Lewis, Zamora, someone named Lamont, and Andy Thompson, fired shots. Zamora fired first, shooting a .38-caliber gun. Lewis fired six shots. After the shooting, Lewis threw the revolver into the bushes.

McDonald told officers there were six shooters and about six guns being fired during the melee. He drove around with detectives to show them where the shooters lived.

**David Lewis**

David Lewis, also detained following the shooting, was tried with [Benson]. Lewis testified he shot a gun the night of the party but did not fire into the crowd or aim at anybody. Lewis met [Benson] at juvenile hall but did not see [Benson] at the party.

Lewis testified he told officers he shot a gun "in the sky" and admitted saying "Fuck Oakland" the night of the shooting. According to Lewis: "I wasn't shooting at nobody. [¶] . . . [¶] . . . I just shot to clear a way, man." Anyone who said Lewis fired into the crowd was lying.

The prosecution also played a taped interview with Lewis and the police. In the interview, Lewis said a fight broke out in the backyard between Oakland guests and Stockton guests. People started throwing gang signs. The two groups traded insults. Oakland partygoers confronted a person from Stockton and someone said, "[B]itch I'm gonna knock you out." In response, "some big dude said, let's take this outside again right now."

As the group gathered out front, people began fighting. According to Lewis, the fight lasted 10 minutes and "We just started shooting." Lewis saw a "whole bunch of people . . . from both sides" shooting. Lewis stated: "They was shooting at the direction. [¶] . . . [¶] That's when I shot up at them." Lewis shot more than five times.

Lewis described the gun as a chrome revolver with "a wooden handle." He threw away the gun when he saw the officers arrive.

**Jesse Zamora**

Zamora, also detained at the scene, testified he is a North Side Gangster Crip, or NSGC, as was his friend, Eddie Ortiz. Zamora testified [Benson] was not a gang member.

Zamora learned of the party from a flier he saw at a Stockton mall. He thought it was a Bay Area party. Zamora called [Benson] and Ortiz and told them about the party. He and Ortiz brought guns to the party.

Zamora and Ortiz drove to the party together; Zamora left his gun in the car but did not know if Ortiz did the same. After the party was shut down and tensions escalated, Zamora got his gun from the car and hung out with [Benson], Ortiz, and Lewis.

The group yelled "Stockton," and Garner approached the group and told them to leave. People began shooting as Garner walked back toward the house.

Zamora testified he saw [Benson] with a "[b]ig" automatic handgun but did not see [Benson] fire the gun. However, Zamora did see Lewis point a gun at the crowd and fire once or twice. Zamora admitted he fired his gun twice in the air but said he only fired to get others to stop shooting.

The jury also heard two statements Zamora gave to the police. Zamora told police he drove to the party with his mother and daughter. He went to the party and people began throwing gang signs and "just screaming out stuff." Zamora saw Lewis firing a gun.

Zamora told officers [Benson] had a gun with a clip. During the party the gun was visible, hanging out of [Benson]'s pocket. [Benson] ignored Zamora's urging to conceal the gun. [Benson] showed the gun, danced in the street, and said, "[T]his is northside." Zamora was carrying [Benson]'s gun when shooting broke out but gave it back to [Benson] when he asked for it. Zamora told police he fired twice in the air.

**Gang Evidence**

Gang expert Detective Michael George testified that [Benson], Lewis, Zamora, and Jonathan Brooks were documented members of the North Side Gangster Crips. The ESO and the EPA were rivals of that gang.

[Benson] admitted to Detective Rodriguez that he associated with and was friends with North Side gang members. However, [Benson] claimed that although he had belonged to the gang when he was younger, he was not currently a member. During a previous stay in juvenile hall, [Benson] admitted being a member of the North Side Gangster Crips.

**Defense Case**

*Defendant's Testimony*

[Benson] admitted knowing North Side Gangster Crips members, such as McDonald, Ortiz, and Zamora. However, he denied belonging to the gang.

[Benson] learned of the party from some girls just prior to the party. During the party, he went out front to smoke, and when he returned to the backyard everyone

5

was told to leave.  Partygoers gathered in front of the house and began exchanging words.

As members of the Stockton group gathered, [Benson] walked over to them "[t]o see what they was [*sic*] doing next, to see if there was another party that night." As he spoke with a friend from high school about going to another party, [Benson] heard shots ring out behind him.  [Benson] did not see anyone with a gun and did not have a gun.  After the shooting began, [Benson] ran to his car.

[Benson] testified he initially told officers he did not shoot the gun.  He altered his story because he felt he had to say what the officers wanted him to say. The officers repeatedly told him it would be all right if he had fired into the air. According to [Benson], "I thought I'd be going home."

In addition, [Benson] testified that after police played a tape of Zamora stating [Benson] had fired a bigger gun, [Benson] falsely claimed that "Booba" gave him a gun, because he knew it was a bigger gun than the one being described and "that gun wasn't at the party that night."  [Benson] told officers that Zamora used a .22-caliber weapon and Lewis used a chrome revolver because someone told him this after the shooting.

*David Lewis*

Lewis testified that after the fight broke out, he fired into the air to "clear a way."  He denied shooting Castillo.  He threw the gun into some bushes.

*Other Partygoers*

McDonald's cousin testified the party ended shortly after she arrived.  She walked around the corner when she left and then heard gunshots coming from "right by the house."

Jasmine Farley also arrived shortly before the party broke up.  As she walked home, she saw two groups yelling at each other, with members of each group reaching into their waistbands as if they had guns.  After she went around the corner, she heard gunshots ring out from near the house.

Maria Farley testified that the party broke up after people began arguing.  As she left, two groups stood on opposite sides of the street arguing, but it did not look like they were going to fight.  As she walked away, she heard shots fired.

*Defendant's Mother*

[Benson's] mother testified that [Benson] is of lower than average intelligence and has learning disabilities.  He has trouble concentrating, and when he shuts down he nods or bumps his head.

[Benson's] mother drilled into his head that when talking to people like the police, he should tell them what they wanted to hear.  Although she knew this was wrong, she did it out of fear that, because of his special needs, he would be taken from her.  [Benson's] mother was also concerned about some of the people [Benson] was hanging out with and talked to him about them.[2]

---

[2] *Id.* at *2-6.

## II.  GROUNDS RAISED/DEFENSES

Benson raises six grounds:  (1) the admission of the McDonald statement violated his rights under the Confrontation Clause; (2) the admission of Benson's statements violated his rights under the Fifth Amendment (self-incrimination); (3) Benson's statement to the police was coerced in violation of the Fourteenth Amendment; (4) Benson's statement to the police was taken in violation of his Sixth Amendment right to counsel; (5) jury tampering/intimidation; and (6) the jury was misinstructed on self-defense.  Respondent does not assert any affirmative defenses.

## III.  STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d), this Court cannot grant relief unless the decision of the state court was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" at the time the state court renders its decision or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."[3]  The Supreme Court has explained that "clearly established Federal law" in § 2254(d)(1) "refers to the holdings, as opposed to the dicta, of [the Supreme Court] as of the time of the relevant state-court decision."[4]  The holding must also be intended to be binding upon the states; that is, the decision must be based upon constitutional grounds, not on the supervisory power of the Supreme Court over federal courts.[5]  Thus, where holdings of the Supreme Court

---

[3] 28 U.S.C. § 2254(d); *Williams v. Taylor*, 529 U.S. 362, 402-06 (2000); *see also Lockyer v. Andrade*, 538 U.S. 63, 70-75 (2003) (explaining this standard).

[4] *Williams*, 529 U.S. at 412 (alteration added).

[5] *Early v. Packer*, 537 U.S. 3, 10 (2002).

regarding the issue presented on habeas review are lacking, "it cannot be said that the state court 'unreasonabl[y] appli[ed] clearly established Federal law.'"[6]  When a claim falls under the "unreasonable application" prong, a state court's application of Supreme Court precedent must be "objectively unreasonable," not just "incorrect or erroneous."[7]  The Supreme Court has made clear that the objectively unreasonable standard is "a substantially higher threshold" than simply believing that the state-court determination was incorrect.[8]  "[A]bsent a specific constitutional violation, federal habeas corpus review of trial error is limited to whether the error 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'"[9]  In a federal habeas proceeding, the standard under which this Court must assess the prejudicial impact of constitutional error in a state court criminal trial is whether the error had a substantial and injurious effect or influence in determining the outcome.[10]  Because state court judgments of

---

[6] *Carey v. Musladin*, 549 U.S. 70, 77 (2006) (alterations in original) (citation omitted); *see also Wright v. Van Patten*, 552 U.S. 120, 126 (2008) (per curiam); *Kessee v. Mendoza-Powers*, 574 F.3d 675, 678-79 (9th Cir. 2009); *Moses v. Payne*, 555 F.3d 742, 753-54 (9th Cir. 2009) (explaining the difference between principles enunciated by the Supreme Court that are directly applicable to the case and principles that must be modified in order to be applied to the case; the former are clearly established precedent for purposes of § 2254(d)(1), the latter are not).

[7] *Wiggins v. Smith*, 539 U.S. 510, 520-21 (2003) (internal quotation marks and citations omitted).

[8] *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) (citing *Williams*, 529 U.S. at 410).

[9] *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 642, 643 (1974)).

[10] *Fry v. Pliler*, 551 U.S. 112, 121 (2007) (adopting the standard set forth in *Brecht v. Abrahamson*, 507 U.S. 619, 637-38 (1993)).

conviction and sentence carry a presumption of finality and legality, the petitioner has the burden

of showing by a preponderance of the evidence that he or she merits habeas relief.[11]

The Supreme Court recently underscored the magnitude of the deference required:

> As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings. *Cf. Felker v. Turpin,* 518 U.S. 651, 664, 116 S.Ct. 2333, 135 L.Ed.2d 827 (1996) (discussing AEDPA's "modified res judicata rule" under § 2244). *It preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents. It goes no farther.* Section 2254(d) reflects the view that habeas corpus is a "guard against extreme malfunctions in the state criminal justice systems," not a substitute for ordinary error correction through appeal. *Jackson v. Virginia,* 443 U.S. 307, 332, n.5, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) (Stevens, J., concurring in judgment). As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.[12]

In applying this standard, this Court reviews the "last reasoned decision" by the state

court.[13] State appellate court decisions that summarily affirm a lower court's opinion without

explanation are presumed to have adopted the reasoning of the lower court.[14] This Court gives

---

[11] *Silva v. Woodford*, 279 F.3d 825, 835 (9th Cir. 2002) (citations omitted); *see Wood v. Bartholomew*, 516 U.S. 1, 8 (1995) (per curiam) (stating that a federal court cannot grant "habeas relief on the basis of little more than speculation with slight support").

[12] *Harrington v. Richter*, 131 S. Ct. 770, 786-87 (2011) (emphasis added).

[13] *Robinson v. Ignacio*, 360 F.3d 1044, 1055 (9th Cir. 2004) (citing *Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir. 2002)); *cf. Ylst v. Nunnemaker*, 501 U.S. 797, 804 (1991) (explaining "how federal courts in habeas proceedings are to determine whether an unexplained order . . . rests primarily on federal law," and noting that federal courts must start by examining "the last reasoned opinion on the claim . . . . ").

[14] *Ylst*, 501 U.S. at 802-03 ("Where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground."); *cf. Richter*, 131 S. Ct. at 784 ("As every Court of Appeals to consider the issue has recognized, determining whether a states court's decision resulted from an unreasonable legal or factual conclusion does not require that there be an opinion from the state

the presumed decision of the state court the same AEDPA deference that it would give a

reasoned decision of the state court.[15]

## IV.  DISCUSSION

Ground 1:  Use of McDonald Statement

When called as a witness at trial, McDonald invoked his Fifth Amendment rights and

refused to testify.  The trial court declined to grant McDonald immunity and declared him

unavailable to testify.  The transcript of McDonald's testimony at the preliminary hearing was

read to the jury, and a video tape of the police interview of McDonald was played for the jury.

Benson contends that this violated his Sixth Amendment right of confrontation.  The California

Court of Appeal, without reaching the confrontation issue, held that although the statement was

inadmissible under the California Evidence Code, its admission was harmless.

> During the preliminary hearing, McDonald testified that he did not know who
> was shooting after the party.  He also stated he did not tell officers that [Benson] and
> other partygoers had guns.  All McDonald could remember about the melee was the
> sound of gunshots.  McDonald testified he did not have a gun or shoot anyone.
> During the preliminary hearing, Detective Rodriguez discussed McDonald's
> statement to police.  McDonald told officers that six people, including [Benson],
> fired shots at the party.
> The trial court ruled that McDonald's preliminary hearing testimony could be
> impeached with his statement to officers.  The court cited Evidence Code section 770
> and determined that evidence of McDonald's prior inconsistent statements was
> admissible.  The court found the statements admissible even though McDonald "may
> not have been presented with those statements" or been given an "opportunity to
> address them in some fashion while on the stand during the preliminary hearing."
> McDonald's preliminary hearing testimony was impeached with his statement
> to police.  In the taped interview, played for the jury, McDonald told officers that
> [Benson], Lewis, Zamora, Ortiz, Lamont, and Thompson all fired weapons.

---

court explaining the state court's reasoning.").

[15] *See Richter*, 131 S. Ct. at 784-85 (rejecting the argument that a summary disposition
was not entitled to § 2254(d) deference).

**Discussion**

The People concede the trial court erred by permitting impeachment of McDonald's preliminary hearing testimony with the videotape of his earlier police interview.  However, the People argue the error was harmless.

Evidence Code section 1294 allows the statement of a person who is unavailable as a witness in court to be introduced as evidence in court if the statement was previously introduced at a hearing or trial as a prior inconsistent statement of the witness.  This section is designed to overcome the admissibility problems associated with out-of-court statements that are inconsistent with an unavailable witness's former testimony, but it requires that the evidence of the statements be introduced at the prior hearing when the witness actually testified.  (*People v. Martinez* (2003) 113 Cal.App.4th 400, 408-409.)

In *People v. Williams* (1976) 16 Cal.3d 663, the Supreme Court considered a factual scenario similar to the present case.  In *Williams,* a suspect gave a statement to officers implicating the defendant in a robbery.  During the preliminary hearing, the suspect denied making the statement.  A detective testified that the suspect had made the statement. (*Id.* at p. 665.)  Although the suspect was not available to testify at trial, the court admitted his preliminary hearing testimony under Evidence Code section 1291, subdivision (a)(2).  The detective repeated his earlier testimony about the prior inconsistent statement, which was admitted at trial as an inconsistent statement under Evidence Code section 1235.  (*Id.* at p. 666.)  Without reaching the question of a defendant's right to confrontation, the Supreme Court held that the prior inconsistent statement was not admissible under Evidence Code section 1235 because the hearsay exception was intended to only apply to the prior inconsistent statement of a witness who testifies at trial.  (*Id.* at pp. 666-669.)

Here, neither the transcript nor the videotape of the police interview was introduced into evidence at the preliminary hearing.  Instead, during the preliminary hearing McDonald was asked if he recalled what he told officers; McDonald testified he could not recall the events surrounding the shooting or his interview with police.  Detective Rodriquez then testified that McDonald told officers in the interview that six people fired guns after the party, including [Benson].

Under Evidence Code section 1294, McDonald's videotaped statement was not admissible at trial, since the taped statement was not introduced into evidence at the preliminary hearing.  We agree with both parties that the trial court erred in allowing the tape to be played.

However, we must determine whether the admission of the taped interview was reversible error.  If the properly admitted evidence is overwhelming and the incriminating extrajudicial statement is merely cumulative of other direct evidence, the error will be deemed harmless.  (*People v. Schmaus* (2003) 109 Cal.App.4th 846, 860.)

According to [Benson], the other evidence that he was involved in the shooting was "extremely weak."  We disagree.

[Benson], an admitted gang member, told officers during an interview that he fired shots into the air after the party broke up.  After officers played a tape of

11

Zamora telling them that [Benson] fired a gun the night of the party, [Benson] admitted he shot a .44-caliber Desert Eagle twice in the air. [Benson] did not challenge Zamora's statements implicating him. [Benson] also admitted picking up two shell cases after he fired the gun. Officers located the gun where [Benson] said he left it.

[Benson] attempts to minimize the impact of his statements to officers. According to [Benson], although he told officers he fired a gun, he recanted this claim shortly afterward. [Benson] also stated he only told police he shot a gun because he believed they would let him go if he made the claim. [Benson] also argues he claimed he used a .44-caliber Desert Eagle because he knew that gun had not been at the party. As for [Benson's] statement that he picked up the shells, [Benson] claims that was "an obvious lie. No one during a firefight pauses to scour the ground for shells and thus expose himself to gunfire unnecessarily."

Despite [Benson's] best efforts to cast doubt on the veracity of his statements to officers, his admissions were compelling. Faced with Zamora's accusation, [Benson] did not deny his involvement, but told officers he fired twice into the air. He identified a gun, which police later recovered, and removed the evidence, shell cases, from the crime scene.

The jury had more than [Benson's] admissions to link him to the shooting. As noted, Zamora told officers [Benson] had a gun with a clip hanging out of his pocket. After the party broke up, [Benson] danced in the street and said, "[T]his is northside." Zamora was carrying [Benson's] gun when the shooting began. [Benson] asked for his gun and Zamora gave it to him.

When Garner, the host, approached [Benson] and other gang members in the street, [Benson] said: "Fuck that nigger, he ain't nobody." As Garner turned, gunfire broke out.

Given the overwhelming evidence before the jury, the improperly admitted statements by McDonald were merely cumulative of the other evidence. The error in the admission of McDonald's videotaped statements was harmless beyond a reasonable doubt. (See *Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705].).[16]

Before this Court may grant relief, it must find that any constitutional error was not harmless. Thus, even assuming that the admission of McDonald's statement also constituted a violation of the Confrontation Clause, Benson is not entitled to relief if its admission was harmless. Specifically, under *Brecht*,[17] this Court must find that the error "had [a] substantial and

---

[16] *Benson*, 2010 WL 46681 at *6-8.

[17] *Brecht v. Abrahamson*, 507 U.S. 619 (1993).

injurious effect or influence in determining the [outcome]."[18]   The determination by a state court

that a constitutional error is harmless is itself subject to the "unreasonableness" test of AEDPA.[19]

While numerous cases applying *Brecht* refer to the overwhelming evidence of the petitioner's

guilt,[20] this tends to overstate the quantum of evidence necessary to establish harmless error

under *Brecht*.[21]   "Only if the record demonstrates that the jury's decision was substantially

influenced by the error or there is grave doubt about whether an error affected a jury will

[Benson] be entitled to relief."[22]   In applying *Brecht*, this Court assesses the strength of the state's

evidence apart from the erroneously admitted evidence.[23]   The Ninth Circuit's decision in

*Valerio*[24] teaches us that the "substantial and injurious effect or influence" test from *Brecht*

presents a higher bar for the state to hurdle than the sufficiency of the evidence test in *Jackson*.[25]

Respondent, rather than Benson, bears the risk of doubt in a *Brecht* harmless error analysis.[26]

---

[18] *Id.* at 622.

[19] *Fry v. Pliler*, 551 U.S. 112, 119-20 (2007).

[20] *See e.g., Moses v. Payne*, 543 F.3d 1090, 1100 (9th Cir. 2008)*, amended* 555 F.3d 742 (9th Cir. 2009); *Larson v. Palmateer*, 515 F.3d 1057, 1064 (9th Cir. 2008); *Jackson v. Brown*, 513 F.3d 1057, 1082 (9th Cir. 2008); *Parle v. Runnels*, 505 F.3d 922, 928 (9th Cir. 2007).

[21] *See, e.g., Brecht*, 507 U.S. at 639 (finding harmless error in part because "the State's evidence of guilt was, if not overwhelming, certainly weighty").

[22] *Sechrest v. Ignacio*, 549 F.3d 789, 808 (9th Cir. 2008) (citations and internal quotation marks omitted).

[23] *Sims v. Brown*, 425 F.3d 560, 570-71 (9th Cir. 2005).

[24] *Valerio v. Crawford*, 306 F.3d 742, 761-62 (9th Cir. 2002) (en banc).

[25] *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in the original).

[26] *See O'Neal v. McAninch*, 513 U.S. 432, 439 (1995).

Thus, Respondent must provide this Court with a "fair assurance" that there was no substantial and injurious effect on the verdict.[27]

In this case, the California Court of Appeal applied the *Chapman* "beyond a reasonable doubt" standard, which is more favorable to the defendant than the *Brecht* "substantial and injurious effect" standard.[28]  This Court applies the *Brecht* standard without regard to the state court's harmlessness determination.[29]  As the California Court of Appeal applying the stricter *Chapman* standard noted, the evidence of Benson's guilt was overwhelming.  Based upon the record before it, applying *Brecht*, this Court cannot say that the determination by the California Court of Appeal that the error in admitting McDonald's statement was harmless was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" at the time it rendered its decision or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."[30]  Benson is not entitled to relief under his first ground.

<u>Grounds 2, 3, and 4:  Interrogation of Benson</u>

In his second ground Benson contends that the admission of the statement he made to the police violated his Fifth Amendment right against self-incrimination.  In his third ground Benson

---

[27] *See Valerio*; *see also O'Neal*, 513 U.S. at 443 ("[T]he State normally bears responsibility for the error that infected the initial trial.").

[28] *See Fry*, 551 U.S. at 116 (noting that *Brecht* is a more forgiving standard of review than *Chapman*).

[29] *Merolillo v. Yates*, 663 F.3d 444, 455 (9th Cir. 2011)*; see Fry*, 551 U.S. at 121 (holding that the *Brecht* standard applies whether or not the state court recognized the error and reviewed it for harmlessness).

[30] 28 U.S.C. § 2254(d).

14

contends that the statement was coerced and its admission violated his due process rights under the Fourteenth Amendment.  In his fourth ground Benson contends the statement was improperly admitted because he was either denied his right to counsel under the Sixth Amendment, or he was seized in violation of the Fourth Amendment.  Because these grounds are intertwined, i.e., they attack the admission of the statement Benson made to police, as did the California Court of Appeal, this Court combines the three issues and addresses them together.  In rejecting Benson's arguments, the Court of Appeal held:

> **Background**
>
> Detectives Rodriguez and Seraypheap interviewed [Benson] twice about the shooting.  The first interview took place on the day officers arrested [Benson]; the second occurred two days later.
>
> Prior to beginning the first interview, officers read [Benson] his *Miranda* rights.  [Benson] was booked into juvenile hall.  Two days later, officers picked up [Benson] from juvenile hall and drove him to the police department for a second interview.
>
> While riding to the police department, [Benson] asked why he was being held, what he was being charged with, and what other people involved had said about the incident.  Detective Rodriguez testified that during the car ride he told [Benson] he would answer his questions once they got to the police department.
>
> Prior to the start of the second interview, officers again gave [Benson] his *Miranda* rights, which [Benson] stated he understood.  After expressing some reluctance to tape recording the interview, [Benson] confirmed that he "still wanted to go through with [it]."  We report the contents of this second interview in some detail.
>
> "Benson:  I want a lawyer.
> "Rodriquez:  You want a lawyer?  OK.
> "Rodriquez:  You have any questions for us?
> "Benson:  Ha?
> "Rodriquez:  You have any questions for us?
> "Rodriquez:  No?
> "Rodriquez:  OK.
> "Benson:  What did you want to talk to me about then?"
> "Rodriquez:  Well we want to go over everything to make, you know, your statement seems to conflict [with] what, what other people were saying and we wanted to make sure that you understood the questions that we were asking you . . ..  I don't want these other people to speak for you.  I want it to come out of your mouth . . ..  [Y]ou know, like we talked about the other day, there were tons of people out

there . . .. [T]he other two that we arrested, you know, they admitted what they had done . . .. [T]hey told us what they saw, who else was out there, who else had guns, who else shot and . . . it seemed to be pretty credible in relationship to what the witnesses there saw, you know, people there at the party, the neighbors . . . and I wanted, you know, [to] give you the every opportunity, cause [*sic*] I spoken [*sic*] to your mom a couple of times . . . I know she's pretty upset about everything.  You're a young kid and, and I just don't want this to get the best of you so . . ..

"Benson:  What they say?  Said I did it still?

"Rodriquez:  Well, I'll be more than happy to go over this with you, but because you asked for a lawyer, you know, I can't, legally.  OK.  If, if you want to talk to me right now I'll be more than happy to talk to you.  But if you want a lawyer then I'll stop.  Cause . . . it's up to you.

"Benson:  And when, where would I get the lawyer?

"Rodriquez:  OK.  Well you're, you're going to court today, you're going to be appointed one.

"Benson:  Go ahead.

"Rodriquez:  You want to talk right now?

"Benson:  [Nods affirmative.]

"Rodriquez:  Are you sure?  Cause you asked for . . . I want to make sure you understand your rights.  OK.  You understand you have the right to a lawyer right?  But still want, want to go over this?

"Rodriquez:  Is that yes?

"Benson:  Ha-huh.

"Rodriquez:  OK.

"Seraypheap:  Let's go over this one more time.

"Rodriquez:  OK.

"Rodriquez:  Let's just go over this one more time and then . . ..

"Benson:  You have the right to remain silent.  Anything you say will, will be held against you in a court of law.  You have a right to have a lawyer present with you to speak or what ever, to speak with you while you be questioned."

Rodriquez reiterated [Benson's] *Miranda* rights, and [Benson] stated he understood his rights.  Benson subsequently told officers he fired a gun twice in the air.

After [Benson] filed a motion to suppress, Rodriquez testified at the suppression hearing that he understood [Benson's] request for an attorney at the beginning of the second interview.  However, Rodriquez asked [Benson] if he had any questions for the officers based on the conversation they had had in the police car en route to the interview.  According to Rodriquez, he did not terminate the interview when [Benson] asked for a lawyer "[b]ecause I had promised him a chance to answer any of his questions."

The trial court denied the motion to suppress, concluding Rodriquez did not engage in interrogation when he asked [Benson], "Do you have any questions for us?"  Rodriquez's question was not "a question which the officer should have known was reasonably likely to elicit an incriminating response from the suspect."

16

**Sixth Amendment Claim**

[Benson] contends his Sixth Amendment right to counsel attached prior to the second interrogation. Therefore, the officers violated his constitutional rights by questioning him without an attorney present. The time sequence surrounding the second interrogation refutes this contention.

Police arrested [Benson] on September 26, 2004. His initial interrogation and incarceration in juvenile hall took place the same day. The second interview began at 9:21 a.m. on September 28, 2004. At 9:57 a.m., an order by the juvenile court to transport [Benson] to the superior court for arraignment was filed. By that point, [Benson] had admitted to officers during the interview that he had shot twice into the air.

The complaint against [Benson] was filed at 10:37 a.m. that day. At trial, [Benson] testified that at the conclusion of the second interview, the detectives attempted to take him to court but could not do so. Instead, they returned [Benson] to juvenile hall. Ultimately, [Benson] appeared in court at 1:24 p.m. on September 28, 2004, and counsel was appointed to represent him.

The Sixth Amendment to the United States Constitution guarantees that in all criminal prosecutions, the accused shall have the right to assistance of counsel. The Sixth Amendment right to counsel attaches ""'at or after the initiation of adversary judicial criminal proceedings—whether by way of formal charge, preliminary hearing, indictment, information, or arraignment.'" [Citation.]" (*McNeil v. Wisconsin* (1991) 501 U.S. 171, 175 [115 L.Ed.2d 158]; see *People v. Slayton* (2001) 26 Cal.4th 1076, 1079.)

Here, [Benson] made his incriminating statements to officers prior to the complaint being filed and prior to his initial appearance in court. The complaint was filed at 10:37 that morning; by 9:57 a.m., [Benson] had already admitted shooting twice into the air. We find no Sixth Amendment violation.

**Fifth Amendment Claim**

[Benson] argues the second interview violated his right against self-incrimination. According to [Benson], once he invoked his right to counsel at the beginning of the interview, all questioning should have ceased.

The Fifth Amendment to the United States Constitution provides that no person "shall be compelled in any criminal case to be a witness against himself." To safeguard this right, the Supreme Court in *Miranda, supra,* 384 U.S. 436 held that once a suspect invokes his or her right to counsel during custodial interrogation, the interrogation must cease until an attorney is present. (*Id.* at pp. 473-474.) Police actions reasonably likely to elicit an incriminating response also constitute interrogation for purposes of *Miranda.* (*Edwards v. Arizona* (1981) 451 U.S. 477 [68 L.Ed.2d 378] (*Edwards* ).)

However, there is no Fifth Amendment violation when an accused initiates further conversation by making statements that reveal a willingness and desire for a generalized discussion about the investigation. If the accused invokes his right to counsel, courts may admit his responses to further questioning only on a finding that he both initiated further discussions with officers, and knowingly and intelligently

17

waived the right he previously invoked.  (*Oregon v. Bradshaw* (1983) 462 U.S. 1039, 1045-1046 [77 L.Ed.2d 405]; *Smith v. Illinois* (1984) 469 U.S. 91, 95 [83 L.Ed.2d 488].)

[Benson] argues that after he invoked his right to counsel in the second interview, the detectives initiated further conversation.  According to [Benson]: "Rodriguez, in a subtle ploy, asked [[Benson]] if he had 'any questions for us.' [Citation.]  The questions [[Benson]] had asked in the car were why police wanted to talk to him again, why he was being held, what charges was he facing, and what statements about him had been made by others. [Citation.]  Thus, Rodriguez knew that asking [[Benson]] if he had 'questions for us' was likely to lead to a repetition of these questions, to accusatory answers from police, and then to substantive responses from [[Benson]] concerning the 9-25-04 shooting."

We disagree with [Benson's] gloss on the evidence.  Prior to arriving at the police station, [Benson] asked the detectives questions during the car ride.  Rodriguez told [Benson] he would answer his questions at the station.  Once at the station, detectives read [Benson] his *Miranda* rights and [Benson] requested counsel.

At this point, Rodriquez asked [Benson] if he had any questions.  [Benson] indicated he did not, but then asked:  "What did you want to talk to me about then?"  Rodriquez told [Benson] he wanted to talk about what other witnesses had told police.

A defendant's *Miranda* rights only come into play when a defendant in custody is subjected to either express questioning or its functional equivalent.  The functional equivalent of express questioning consists of words or actions on the part of police that they should know are reasonably likely to elicit an incriminating response.  (*Rhode Island v. Innis* (1980) 446 U.S. 291, 302-303 [64 L.Ed.2d 297] (*Rhode Island* ).)

California courts have characterized this definition as a two-part inquiry:  first, was the officer's remark or action the type reasonably likely to elicit an incriminating response; and second, even if the officer did not intend to elicit such a response, should that officer have known the action or remark was likely to do so?  (*People v. Mobley* (1999) 72 Cal.App.4th 761, 792 (*Mobley* ); *People v. O'Sullivan* (1990) 217 Cal.App.3d 237, 241-242.)

Detective Rodriquez asked [Benson] if he had any questions after [Benson] invoked his right to counsel.  This neutral inquiry, which could have referred to any type of question, including questions about the requested counsel, elicited a negative response from [Benson].  Such a remark by an officer is not reasonably likely to elicit an incriminating response, nor should Rodriquez have known his query was likely to do so.

As the United States Supreme Court reasoned:  "[S]ince the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response."  (*Rhode Island, supra,* 446 U.S. at pp. 301-302.)  An officer's query as to whether a suspect has any questions does not fall into this category.  (See *People v.*

*Clark* (1993) 5 Cal.4th 950, 981-986; *Mobley, supra,* 72 Cal.App .4th at p. 792; *People v. Claxton* (1982) 129 Cal.App.3d 638, 647-655.)

[Benson] then renewed the conversation, notwithstanding his request for counsel, by asking, "What did you want to talk to me about then?"  A conversation initiated by a suspect, after he asked for an attorney during custodial interrogation, does not violate *Miranda.*  (*Edwards, supra,* 451 U.S. at pp. 485-486.)

**Fourteenth Amendment Claim**

[Benson] contends his due process rights were violated because detectives obtained his statements through false promises of leniency.  [Benson] cites several comments by both detectives as constituting false promises of leniency.

*Background*

During the initial interview on September 26, 2004, detectives told [Benson] many people were saying they saw [Benson] with a gun.  Detective Rodriquez told [Benson] there could be a "million" reasons [Benson] had a gun after the party, "but don't dig yourself a hole by . . . saying, you know, that wasn't me."  Rodriquez also told [Benson] he did not want to disrupt [Benson's] life for making "one simple mistake," since "there's a solution to every mistake.  You need some help right now." [Benson] continued to deny shooting a gun.

Rodriquez noted people often carry guns for protection even though they are not in a gang.  Rodriquez said:  "If something like that happened last night, that maybe you just had something in your pocket.  Someone might have saw [*sic* ] it and just cause . . . there's a shooting they automatically think Jimmy, that's Jimmy cause I saw em [*sic*] with a gun.  I don't want you to get caught on the wrong foot on this one.  If you had something in your pocket, it never left your pocket during all this. That's what you need to let us know."  [Benson] again denied he had a gun, and Seraypheap said other people would testify [Benson] had a gun and [Benson] would be charged with homicide.  At that point [Benson] admitted he passed a gun on to Lewis, who shot it.

Rodriquez then said:  "Maybe you fired a shot not wanting to hurt someone. Maybe you shot up in the air, maybe you purposely shot in the ground, maybe you just pointed a gun.  I mean that's a big difference between, you know, someone getting hurt and trying to shoot someone."  [Benson] again stated he did not shoot or point a gun.

During the second interview, [Benson] reiterated that he had not shot a gun. Rodriquez then played a tape of Zamora stating he saw [Benson] with a big gun. Rodriquez stated all the victims were shot with small-caliber bullets.  Rodriquez again suggested that perhaps [Benson] was simply shooting up in the air or in the ground, but "[i]f you expect us to believe that you're not a murderer then you got to be honest with us."  When Rodriquez asked if [Benson] shot just to scare everybody, [Benson] nodded his head.  When asked how many times he fired into the air, [Benson] raised two fingers.

Shortly thereafter, [Benson] recanted, stating the officers had scared him and he merely repeated what they said "so you can help me get out."  [Benson] said he admitted shooting the gun "[j]ust because, so you all can let me go."  Rodriquez

denied saying they would let him go, and [Benson] replied: "[Y]ou didn't say you was going to let me go, but the way you was saying like you all was going to let me go . . .." Rodriquez told [Benson] he would face charges, but "what you tell us, that, that's going to depend how they're going to treat you.  What's going to happen to you."

*Discussion*

   Under the Fourteenth Amendment to the United States Constitution, any involuntary statement obtained by a law enforcement officer by coercion is inadmissible in a criminal proceeding.  (*People v. Neal* (2003) 31 Cal.4th 63, 67 (*Neal* ).)  A confession is involuntary if it is obtained by overcoming the defendant's will, such as by threats or violence or any direct or implied promise.  (*People v. Cahill* (1994) 22 Cal.App.4th 296, 310-311 (*Cahill* ).)  A confession elicited by promises of benefit or leniency is inadmissible.  However, mere advice or pleas by the officer that it would be better for the suspect to tell the truth when unaccompanied by either threat or promise does not render a subsequent confession involuntary.  (*People v. Carr* (1972) 8 Cal.3d 287, 296; *People v. Sultana* (1988) 204 Cal.App.3d 511, 522.)

   The prosecution bears the burden of proving, by a preponderance of the evidence, that [Benson's] confession was voluntary.  (*People v. Ray* (1996) 13 Cal.4th 313, 336, fn. 10 (*Ray*).)  Voluntariness does not turn on any one fact, but rather on the totality of the circumstances.  (*Neal, supra,* 31 Cal.4th at p. 79.)  On appeal, we uphold the trial court's findings as to the circumstances surrounding the confession if supported by substantial evidence.  The trial court's finding as to the voluntariness of the confession is subject to independent review.  (*People v. Massie* (1998) 19 Cal.4th 550, 576.)

   [Benson] contends the detectives obtained his admissions only after lying about the evidence against him and misstating the law on homicide.  In addition, [Benson] argues, the detectives falsely implied that if he cooperated he would receive more lenient treatment at the hands of the police, the prosecution, or the court.

   The People concede the detectives lied to [Benson] about the caliber of the bullet that killed Castillo.  Although detectives told [Benson] two other suspects had implicated him in the shooting, only one, Zamora, actually implicated [Benson].  Detectives also told [Benson] the person who fired the smaller gun fired the lethal shot and implied that the person who fired the larger gun was less culpable in the shooting.

   However, the People argue that "although the lies the detective told [[Benson]] may have contributed to eliciting his admission, those lies were not likely to elicit an unreliable admission."  According to the People, if [Benson] were innocent it would be unlikely the detectives' statements about the size of the gun would compel him to falsely admit firing any gun.

   [Benson] disagrees, arguing the detectives acted improperly and coerced his admissions.  In support, [Benson] cites *Cahill, supra,* 22 Cal.App.4th 296.  In *Cahill,* officers told the defendant they had all the physical evidence they needed to place him at the scene of the crime.  One officer told the defendant: "'I'm here really to try

to see what I can do for you.'" (*Id.* at p. 305.)  The officer then outlined the law of murder, but made no reference to felony murder.  In addition, the officer told the defendant he could help himself by talking and suggested he could avoid a first degree murder conviction by admitting an unpremeditated role in the murder.  (*Id.* at pp. 306-307, 314-315 .)

We found the defendant's confession was obtained by a false promise of leniency, that the defendant could avoid a first degree murder conviction by admitting to behavior that was not premeditated.  (*Cahill, supra,* 22 Cal.App.4th at p. 314.)  We found the officer's description of the law materially deceptive.  (*Id.* at p. 315.)

[Benson] analogizes his situation to that of the defendant in *Cahill.*  The two cases are quite different.  Here, Detective Rodriguez did tell [Benson] there was "a big difference between . . . someone getting hurt and trying to shoot someone."  However, the detectives made no promises or representations that [Benson's] cooperation would garner more lenient treatment or lesser charges.  "No specific benefit in terms of lesser charges was promised or even discussed, and [the detective's] general assertion that the circumstances of a killing could 'make[ ] a lot of difference' to the punishment, while perhaps optimistic, was not materially deceptive." (*People v. Holloway* (2004) 33 Cal.4th 96, 117.)  The general assertion that the circumstances of a killing could make a difference was not materially deceptive.  It is not deceptive to state that an accomplice to murder may be better off than the shooter.  (*People v. Garcia* (1984) 36 Cal.3d 539, 546-547.)

Nor does the detectives' use of false information render [Benson's] admissions involuntary.  Lies told by officers to a suspect during questioning may well affect the voluntariness of a confession, but they are not per se sufficient to render a confession involuntary.  Where the deception by the officer is not of a type reasonably likely to procure an untrue statement, a finding of involuntariness is unwarranted . (*People v. Farnam* (2002) 28 Cal.4th 107, 182 (*Farnam* ).)  Courts prohibit only those psychological ploys that, under the totality of circumstances, are so coercive they tend to produce a statement that is both involuntary and unreliable. (*Ray, supra,* 13 Cal.4th at p. 340.)

In *Farnam, supra,* 28 Cal.4th 107, the court found the defendant's confession to an assault and robbery was voluntary.  The officers falsely told the defendant that his fingerprints had been found on the victim's wallet.  (*Id.* at pp. 182-183.)  Nor did the court find a confession coerced when an officer made false statements regarding evidence the officer said tied the defendant to a murder.  (*People v. Thompson* (1990) 50 Cal.3d 134, 167.)

Here, while the officers made several false representations while questioning [Benson], those representations were not of a sort likely to produce an unreliable statement.  Nor did the officers make any offers of leniency or threaten [Benson] with dire consequences for failing to confess.  We do not find [Benson's] admissions involuntary.[31]

---

[31] *Benson*, 2010 WL 46681 at *9-15.

It is undisputed that the statements Benson made to police that he tried to suppress were made after Benson was in custody, had been read his *Miranda* rights,[32] and had requested counsel.  It is also undisputed that at the time Benson made the statements counsel had not been appointed.  The privilege against self-incrimination while an individual is in custody embodied in *Miranda* and its progeny is not whether he or she is allowed to talk with the police without the benefit of warnings and counsel, but whether he can be interrogated.[33]  The trial court found that the statements Benson made were not the result of an interrogation.  This factual determination is presumptively correct, which must be overcome by clear and convincing evidence.[34]  Benson has failed to shoulder this burden.  Moreover, even if the statements were made in response to an interrogation, Benson would not prevail if he either made the statements voluntarily,[35] or he waived his rights.

In the context of the right to remain silent, as with the right to counsel, a suspect must invoke his or her right unambiguously.  If the statement is ambiguous or equivocal, or if no statement is made, the police are not required to either end the interrogation or seek clarification whether or not the accused wants to invoke his or her *Miranda* rights.[36]  Even absent the accused's invocation of the right to remain silent, the accused's statement during a custodial interrogation is inadmissible at trial unless the prosecution can establish that the accused "in fact

---

[32] *Miranda v Arizona*, 384 U.S. 436 (1966).  A short-hand reference to the failure to adequately inform a defendant of his rights to remain silent and to the assistance of counsel.

[33] *See Rhode Island v. Innis*, 446 U.S. 291, 299-302 (1980).

[34] 28 U.S.C. § 2254(e)(1).

[35] *Miranda*, 384 U.S. at 478 ("Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today.").

[36] *Berghuis v. Thompkins*, 130 S. Ct. 2250, 2259-60 (2010).

knowingly and voluntarily waived [his or her *Miranda*] rights" when making the statement.[37]
The waiver, however, need not be express and may be implied by all the circumstances.[38]  The
appropriate test is the "totality of the circumstances."[39]  To establish a valid *Miranda* waiver, the
State must establish three elements:  (1) a *Miranda* warning was given; (2) the accused
understood his or her rights; and (3) the statement was uncoerced.[40]  These elements must be
established by a preponderance of the evidence.[41]

The facts of this case do not compel the conclusion that Benson did not make the
statements voluntarily or that he had unambiguously invoked his right to remain silent, leaving
the question of waiver.  It is unquestioned that the first two elements of a *Miranda* waiver exist
here.  Thus, the outcome on this issue is whether, as Benson contends, he was "coerced" into
making the statement.  It is not clear from Benson's Petition just what actions taken by the police
were coercive.  As the Court of Appeal found, there is no evidence that Benson was either
threatened or given false promises of leniency.[42]  Accordingly, this Court cannot find that the
Benson did not validly waive his *Miranda* rights.

-----

[37] *North Carolina v. Butler*, 441 U.S. 369, 373 (1979).

[38] *Id.* at 373, 376.

[39] *See Fare v. Michael C.*, 442 U.S. 707, 725 (1979) (totality of the circumstances
analysis is appropriate to determine the validity of a juvenile's *Miranda* waiver).

[40] *Berghuis*, 130 S. Ct. at 2261-62.

[41] *Colorado v. Connelly*, 479 U.S. 157, 168 (1986).

[42] *See Hutto v. Ross*, 429 U.S. 28, 30 (1976) (Law enforcement may not extract a
confession "by any sort of threats or violence," and a confession may not be "obtained by any
direct or implied promises, however slight, [or] by the exertion of improper influence" (quoting
*Bram v. United States*, 168 U.S. 532, 542-43 (1897))).

Although the facts in this case establishing a valid *Miranda* waiver, that finding alone is insufficient to support admissibility of the statement.  Benson made the inculpatory statements during an interrogation occurring early on the third day of his incarceration, not during his initial interrogation at the time he was taken into custody.  The Supreme Court has held:

> [W]hen an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights . . . .  [He] is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police.[43]

In light of Benson's extended period of incarceration, he was clearly in "custody" sufficient to present a serious danger of coercion.[44]  Accordingly, the presumption of involuntariness in *Edwards* was triggered.[45]  Thus, whether the statements were properly admitted turns upon whether Benson "(a) initiated further discussions with the police and (b) knowingly and intelligently waived the right he had invoked."[46]

The California Court of Appeal found that Benson had, in fact, initiated the further conversation and intelligently waived the right to consult with counsel prior to further discussions.  This factual finding is presumptively correct unless overcome by clear and

---

[43] *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981).

[44] *See Howes v. Fields*, 132 S. Ct. 1181, 1189-91 (2012) (discussing the various factors to be considered to determine if a defendant was in custody).

[45] *Cf. Maryland v. Shatzer*, 130 S. Ct. 1213, 1219-20 (2010) (in upholding the application of the more lenient *Miranda* waiver in a case in which the *Miranda* warning was given at the outset of the initial interrogation, the Court explained that the *Edwards* presumption of involuntariness is premised on the coercive effect of the mounting pressures of "prolonged police custody").

[46] *Smith v. Illinois*, 469 U.S. 91, 95 (1984).

convincing evidence.[47]  The issue before this Court is whether the decision of the California

Court of Appeal "was contrary to, or involved an unreasonable application of, clearly established

Federal law, as determined by the Supreme Court of the United States."[48]  In this context,

"clearly established law" signifies "the holdings, as opposed to the dicta, of [the Supreme]

Court's decisions."[49]  Based upon the thorough analysis of both the law and the facts in this case

by the California Court of Appeal, this Court cannot hold that the state court decision was not

only incorrect or erroneous, but that its decision was objectively unreasonable; i.e., the state

court's decision was not objectively unreasonable.[50]  Benson is not entitled to relief under his

second, third, or fourth grounds.

Ground 5:  Jury Tampering

During the trial a juror informed the court and her fellow jurors that attempts to

intimidate her had been going on for two weeks.  The trial court dismissed the juror in question

and replaced her with an alternate but, after questioning the remaining members of the jury,

denied Benson's request for a mistrial.  Benson argues that the jurors' impartiality had been

compromised and a mistrial should have been declared.  Benson also contends that the juror in

question committed misconduct in not reporting the incidents earlier.  The California Court of

Appeal disagreed:

---

[47] 28 U.S.C. § 2254(e)(1); *see Smith v. Phillips*, 455 U.S. 209, 218 (1982) (citing 28 U.S.C. § 2254(d); *Sumner v. Mata*, 449 U.S. 539, 551 (1981)).

[48] 28 U.S.C. § 2254(d)(1).

[49] *Williams*, 529 U.S. at 412.

[50] *Wiggins*, 539 U.S. at 520-21.

During jury selection, one prospective juror stated she was fearful of serving on a jury because she might be recognized as a juror after the verdict. In fact, the prospective juror had been forced to move to a small town to avoid living near gang members.

The court told the jurors that jury information was sealed at the end of trial. The court continued: "With regard to the course of the trial, certainly any attempt verbally or otherwise to influence your decision must be brought to the Court's attention, will be dealt with immediately and will be dealt with strongly. You should realize that. You need to bring that to the Court's attention. [¶] . . . [¶] [I]f there were any concerns at all, we look both for verbal issues and nonverbal, we look for attitudes and for any activities that go on in the courthouse, surrounding or here in the courtroom, so [you] should understand people are very vigilant about your concerns."

Unfortunately, juror intimidation did take place during the trial. On the first day of deliberations, Juror No. 6 informed the court of several troubling incidents involving third parties. During a break in the trial, a woman from the courtroom audience who was getting into a car at a nearby drugstore tried to get Juror No. 6's attention. The woman kept saying "Miss, Miss." A male followed Juror No. 6 into the store. Frightened, Juror No. 6 left the store. Juror No. 6 told Juror No. 9 she was afraid, and the two jurors began carpooling to and from the courthouse.

On another occasion, as Juror No. 6 waited for a bus, someone passed by in a van and extended his or her forefinger and thumb "like they was going to shoot me or something." Juror No. 6 did not connect the person who made the gesture with anyone present at the trial.

Juror No. 6 also saw the mother of one of the defendants at a department store. The juror had two sons, ages 22 and 35, and was "scared for my boys because I saw one of the ladies—one day I saw one of the boy's mother when we went to JC Penney's. And she don't know me and I don't know her, but I saw her out. And then I thought about what if I be out—and I have a teen-age boy that's 22—see us walking together and see me. And I just don't want nothing to happen to my kids."

Juror No. 6 told the court she had told the other jurors about the incident where the person in the van simulated a gun. The court excused Juror No. 6. The prosecutor proposed questioning the jurors to see "if they can put this out of their mind." [Benson's] counsel requested a mistrial or, in the alternative, that the court advise the jurors that the persons responsible for the intimidation were related to codefendant Lewis, not to [Benson]. The court deferred its ruling, noting it was unsure whether the matter "can be remedied even if [the jurors] say it doesn't impact" them.

The court and counsel interviewed each juror about the impact of Juror No. 6's revelations.

*Juror No. 1*

Juror No. 1 stated that Juror No. 6 "thought she had been threatened on a couple of occasions." Juror No. 6 was frightened and had encountered relatives of

one of the defendants.  Juror No. 1 did not know who was responsible for the intimidation and stated it would not "bother me one way or another."

*Juror No. 2*

According to Juror No. 2, someone from the courtroom audience tried to get Juror No. 6's attention, and when "she did turn to look at these people, that the gentleman gestured like he had a gun."  Juror No. 6 did not know who was responsible. However, Juror No. 6 was scared that "these people could recognize her away from here in her everyday life."  Juror No. 2 said, "I don't think it's going to affect me."

*Juror No. 3*

Juror No. 3 told the court that Juror No. 6 said "members of one or the other defendant's families appeared or were in the area and one of them apparently followed her into [a store] and did a hand gesture which sounded very threatening." Juror No. 3 did not know which defendant's family was involved, but did not doubt her story.  Juror No. 3 stated all the jurors told Juror No. 6 she had a "legitimate fear" given the "nature of the case" and she should "say something" to the court.  Juror No. 3 stated the information would not affect his/her ability to be fair.

*Juror No. 4*

Juror No. 4 related that Juror No. 6 "mentioned that there had been a situation where she felt as though there was family members that she had seen in the courtroom that tried to get her attention after court one day."  Juror No. 6 was uncomfortable, fearful, and visibly upset.  Juror No. 4 said it would not impact his/her ability to be fair.

*Juror No. 5*

Juror No. 5 stated Juror No. 6 mentioned a relative of one of the defendants made a gun gesture with a thumb and finger, but "she said she didn't really look at them, just kind of got a glance in, perhaps she may not have even seen a reflection." Juror No. 5 concluded it was "probably some relative or friend from one of the defendants."  Juror No. 5 said it would not carry over into his/her deliberations.

*Juror No. 7*

According to Juror No. 7, when Juror No. 6 recounted the incident, she teared up, worried about her sons' safety.  Juror No. 7 said it would not impact his ability to be fair.

*Juror No. 8*

Juror No. 8 recounted that Juror No. 6 said she "thought she recognized some family member from one of the defendants in the court.  And then at noon, I guess she was walking over to the [store] and somebody called out to her and gave her a sign, something like this [indicating a gun with thumb and index finger] . . .. [¶] . . . [¶]  Like you were playing with a gun or something.  And it seemed to unnerve her an awful lot."  According to Juror No. 8, there was a "50/50 chance" [Benson's] family was involved.  Juror No. 8 said this was "just like in the movies or in the papers" where "you hear someone being intimidated ."  Juror No. 8 said it would not impact his ability to be fair.

*Juror No. 9*

Juror No. 9 told the court that Juror No. 6 said someone from the courtroom audience, "family members or who, I don't know if they had said something to her or made some sort of gesture.  They made her very uncomfortable . . ..  It's got her very shaken."  Juror No. 6 said someone said, "Hey, Miss" to her and she saw a hand gesture, but Juror No. 9 was not sure if the gesture was directed at Juror No. 6.  Juror No. 9 began carpooling with Juror No. 6 because Juror No. 6 had trouble getting to court on time when taking the bus.  Juror No. 6 mentioned she was uneasy, but Juror No. 9 considered it a "general thing" and did not know the details until the first day of deliberations.  Juror No. 6 did not know who the intimidators were and had not determined whether they were related to [Benson] or to Lewis.  Juror No. 9 stated the information would not impact her ability to be fair to both sides.

*Juror No. 10*

Juror No. 10 said Juror No. 6 told jurors that a member of one of the two families was "trying to talk to her.  And so she ignored them.  And then she felt like they followed her into a store and she felt like somebody did a hand movement that was scary."  Juror No. 6 was frightened because she lived near where the shooting occurred, and she might run into someone involved in the incident.  Juror No. 10 said it would not impact her ability to be fair, nor did she know who was involved.

*Juror No. 11*

According to Juror No. 11, Juror No. 6 reported family members from the courtroom called out to her and made a threatening hand gesture.  Juror No. 6 "was visibly upset today when she was talking about that and felt that any decision that she made regarding the case could have some repercussions."  Juror No. 11 was not sure who was involved in the incidents, and they would not impact his/her ability to be fair.

*Juror No. 12*

Juror No. 12 told the court Juror No. 6 was emotional when recounting the incident that occurred at the store.  Juror No. 6 did not connect the incident to [Benson].  Juror No. 12 said it would not impact his/her ability to be fair.

**Trial Court's Ruling**

After the interviews, defense counsel requested a mistrial.  The court denied the motion, reasoning:  "I would like to note for the record that in questioning the—the eleven remaining jurors . . ., the demeanor of each juror when asked the question whether or not if these events occurred at all it would affect their ability to be fair in each case, that each of the eleven gave what I found to be a strong response, without hesitation or doubt, that it would not affect their ability to be fair and to deliberate in this matter.  And that it would not have any effect on their ability to do so.  [¶]  Each seemed to clearly understand that this was not evidence, that it would not enter into their deliberations in any fashion.  [¶]  And I think it's important to note for the record their demeanor in this regard:  None of them seemed to bear—or to have been personally affected by the emotional response [Juror No. 6] had to her responsibilities to deliberate.  Each seemed to be quite sanguine and to be quite rational and very as I say strongly and directly and without doubt or hesitation, responded to each of the Court's questions regarding their ability to be fair.  [¶]  The

28

Court feels that the jury has not been so—has not been tainted and has not in any manner, and as a result that the trial may in fact proceed and the motion for mistrial must be denied."

The trial court also denied defense counsel's request for a jury instruction or admonition as to who intimidated Juror No. 6.  The court substituted an alternate juror for the dismissed Juror No. 6 and deliberations recommenced.  The newly constituted jury reached verdicts after a little more than three additional hours of deliberation.  [Benson] made a motion for a new trial based in part on jury tampering and jury misconduct.  The court denied the motion.

**Discussion**

The Sixth Amendment gives a defendant the right to a trial by an impartial jury.  (U.S. Const., Amend. VI; see U.S. Const., Amend XIV & Cal. Const., art. I, § 16.)  "'In a criminal case, any private communication, contact, or tampering, directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial . . . .'  [Citation.]" (*Remmer v. United States* (1956) 350 U.S. 377, 379 [100 L.Ed. 435].)

"Any presumption of prejudice is rebutted, and the verdict will not be disturbed, if the entire record in the particular case, including the nature of the misconduct or other event, and the surrounding circumstances, indicates there is no reasonable probability of prejudice, i.e., no *substantial likelihood* that one or more jurors were actually biased against the defendant.  [Citations.]  [¶]  The standard is a pragmatic one, mindful of the 'day-to-day realities of courtroom life' [citation] and of society's strong competing interest in the stability of criminal verdicts [citations].  It is 'virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote.'  [Citation.]  Moreover, the jury is a 'fundamentally human' institution; the unavoidable fact that jurors bring diverse backgrounds, philosophies, and personalities into the jury room is both the strength and the weakness of the institution.  [Citation.]  '[T]he criminal justice system must not be rendered impotent in quest of an ever-elusive perfection . . . .  If the system is to function at all, we must tolerate a certain amount of imperfection short of actual bias."  (*In re Hamilton* (1999) 20 Cal.4th 273, 296.)

[Benson] contends the trial court's denial of his motion for a new trial "rested primarily on the jurors' assurances" and labels this purported reliance "irrational."  According to [Benson], the image of a trial spectator "following a juror, attracting her attention and pretending to fire a gun at her is simply too vivid to forget and too horrifying to ignore."  Therefore, it was highly unlikely that a juror could exercise independent judgment after exposure to this information regardless of the juror's verbal representations to the contrary.

Although Juror No. 6's experiences clearly troubled her, the connection between the incidents and [Benson] was tenuous at best.  Juror No. 6 stated a courtroom spectator called out to her, but she did not know the person's relation to any of the parties at trial.  On another occasion, while Juror No. 6 waited for a bus, someone passed by and simulated a gun with a hand gesture.  Juror No. 6 did not connect that person with anyone present at trial.

However, these two discrete events became entangled in the retelling by various fellow jurors. Faced with this distraction, the trial court questioned each juror as to his or her understanding of what Juror No. 6 had reported and his or her reaction. All of the jurors stated, without equivocation, that Juror No. 6's experiences would not influence them in their duty as jurors. The court noted their demeanor: "None of them seemed to bear—or to have been personally affected by the emotional response" of Juror No. 6. All of the jurors appeared to the court to be "quite rational" and expressly responded to the court's queries about their ability to be fair "without doubt or hesitation."

Our review of the record reveals the trial court's determination is supported by substantial evidence. (*People v. Farley* (2009) 46 Cal.4th 1053, 1094.) Nothing in the jurors' answers raised the specter of partiality stemming from Juror No. 6's experiences. While each juror remembered Juror No. 6's recitation of events slightly differently, each and every juror assured the court that this knowledge would have no impact on his or her evaluation of the evidence at trial. We accept the trial court's credibility determinations, since the trial court is in a far superior position to evaluate the tenor and demeanor of each juror's responses. (*People v. Danks* (2004) 32 Cal.4th 269, 303-304.).[51]

This Court will first address Benson's allegation that Juror No. 6 should have brought the intimidating actions to the attention of the court. Even if Benson is correct, Juror No. 6 was excused. Thus, any prejudicial effect with respect to Juror No. 6 was extinguished.

With respect to jury tampering, as the California Court of Appeal correctly noted, the prosecution has the burden of proving a lack of prejudice.[52] While prejudice is presumed, the inquiry is nonetheless whether the intrusion affected the jury's deliberations and, therefore, its verdict.[53] However, the Supreme Court has also cautioned:

"[D]ue process does not require a new trial every time a juror has been placed in a potentially compromising situation. Were that the rule, few trials would be constitutionally acceptable . . . . [I]t is virtually impossible to shield jurors from every

---

[51] *Benson*, 2010 WL 46681 at *15-19.

[52] *Remmer v. United States*, 347 U.S. 227, 229 (1954) ("In a criminal case, any private communication, contact, or tampering directly or indirectly, with a juror during a trial about the matter pending before the jury is . . . deemed presumptively prejudicial . . . .").

[53] *See United States v. Olano*, 507 U.S. 725, 738-39 (1993).

> contact or influence that might theoretically affect their vote.  Due process means a
> jury capable and willing to decide the case solely on the evidence before it, and a trial
> judge ever watchful to prevent prejudicial occurrences and to determine the effect of
> such occurrences when they happen."[54]

The California rule as recited by the California Court of Appeal is similar.  Thus, the California

Court of Appeal applied the proper rule.

The trial court dismissed Juror No. 6; accordingly, the prejudicial effect on that juror is no

longer an issue.  The sole remaining question is whether the incidents involving Juror No. 6

prejudiced the remaining jurors.  The remedy for allegations of jury tampering is a hearing in

which the defendant has the opportunity to establish the existence of bias.[55]  The trial court held a

hearing in which each of the remaining jurors was questioned about the alleged "tampering" with

Juror No. 6 and its impact on him or her.  After questioning each juror individually, the trial

court determined that Juror No. 6's experience would not influence them in their duty as jurors.

This determination is presumptively correct unless overcome by clear and convincing evidence.[56]

Benson is not entitled to relief under his fifth ground.

Ground 6:  Self-Defense Instruction

The trial court gave a self-defense instruction to the jury.  On appeal, Benson argued that

the trial court gave the wrong self-defense instruction.  The California Court of Appeal held that,

even if the trial court misinstructed the jury on self-defense, because there was a lack of evidence

to support a self-defense instruction in any event, any error was harmless:

*Self-Defense Instruction*

---

[54] *Olano*, 507 U.S. at 738 (quoting *Phillips*, 455 U.S. at 217).

[55] *Phillips*, 455 U.S. at 215.

[56] 28 U.S.C. § 2254(e)(1); *Phillips*, 455 U.S. at 218.

[Benson] claims the court's instructions on self-defense misled the jury and led to his conviction. The court instructed the jury: "Before you may decide whether the defendant is guilty of murder and attempted murders, you must decide whether he is guilty of assault with a firearm or shooting a firearm in a grossly negligent manner." The court also instructed that in order to find [Benson] guilty of an assault with a firearm, the prosecution must prove "the defendant [did] not act in self-defense or in defense of someone else." In the same vein, the court instructed that to find [Benson] guilty of shooting a firearm in a grossly negligent manner, the prosecution must prove "the [defendant] did not act in self-defense or in defense of someone else."

The court also instructed on the definition of selfdefense [*sic*]: "[T]he defendant acted in lawful self-defense if: [¶] One, the defendant reasonably believed that he was in imminent danger of being killed or suffering great bodily injury; [¶] Two, the defendant reasonably believed that the immediate use of deadly force was necessary to defend against the danger; [¶] And, three, the defendant used no more force than was reasonably necessary to defend against that danger." The court also instructed on imperfect self-defense.

A trial court has a duty to instruct on a defense only if the defense is supported by substantial evidence. (*People v. Curtis* (1994) 30 Cal.App.4th 1337, 1355.) Self-defense requires that the [Benson] show he was in actual fear of his life or serious bodily injury and that the conduct of the other party was such as to produce that state of mind in a reasonable person. (*People v. Watie* (2002) 100 Cal.App.4th 866, 877.)

[Benson] faults the trial court for instructing that in order to find he acted in self-defense, he must have believed deadly force was necessary. According to [Benson], in a videotaped interview he told officers he shot a gun into the air the night of the murder after others started shooting. He fired so others would "get scared so they won't shoot me." Therefore, [Benson] argues, he did not believe he had to use deadly force, but instead used nondeadly [*sic*] force to defend himself. Even if the jury believed his videotaped statements, under the instructions given it could not find [Benson] acted in selfdefense [*sic*].

However, even if the court erred in instructing on self-defense, any error was harmless. (*People v. Salas* (2006) 37 Cal.4th 967, 984.) The evidence revealed [Benson] and his fellow gang members arrived at the party armed and, without provocation, opened fire on partygoers. There was no evidence that the victims or anyone else provoked the attacks or opened fire on [Benson] and his fellow gang members. The only evidence that [Benson] acted in self-defense was his own self-serving testimony during police questioning. There is no reasonable likelihood that had the court instructed as [Benson] suggests, the jury would have found [Benson] fired into the air in self-defense.[57]

---

[57] *Benson*, 2010 WL 46681 at *25-26.

Benson argues that the finding of the Court of Appeal that there was insufficient evidence to support a self-defense instruction under California law was erroneous, thereby violating his due process right.  It is a fundamental precept of dual federalism that the States possess primary authority for defining and enforcing the criminal law.[58]  In reviewing the decision of a state court, this Court is bound by the state court's interpretations of state law,[59] and it must presume the correctness of the state court's factual findings in the absence of "clear and convincing evidence" to the contrary.[60]  Consequently, because the California Court of Appeal held that there was insufficient evidence to support a self-defense instruction under state law, this ends the inquiry.[61] Benson is not entitled to relief under his sixth ground.

_____

[58] *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (a federal habeas court cannot reexamine a state court's interpretation and application of state law); *Walton v. Arizona*, 497 U.S. 639, 653 (1990) (it is presumed that the state court knew and correctly applied state law)*, overruled on other grounds by Ring v. Arizona*, 536 U.S. 584 (2002); *see also Engle v. Isaac*, , 119 (1982) (challenging the correctness of the application of state law does not allege a deprivation of federal rights sufficient for habeas relief); *Bell v. Cone*, 543 U.S. 447, 455 (2005) (a federal court may not lightly presume that a state court failed to apply its own law).

[59] *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005); *see West v. AT&T*, 311 U.S. 223, 236 (1940) ("[T]he highest court of the state is the final arbiter of what is state law.  When it has spoken, its pronouncement is to be accepted by federal courts as defining state law . . . .").

[60] 28 U.S.C. § 2254(e)(1); *see Rodgers v. Marshall*, 678 F.3d 1140, 1154 n.1 (9th Cir. 2012); *Moses v. Payne*, 555 F.3d 742, 746 (9th Cir. 2009); *Stevenson v. Lewis*, 384 F.3d 1069, 1072 (9th Cir. 2004).

[61] *Swarthout v. Cooke*, 131 S. Ct. 859, 863 (2011) (per curiam) (holding that it is of no federal concern whether state law was correctly applied); *see Waddington v. Sarausad*, 555 U.S. 179, 189, n.5 (2009) ("The Washington Supreme Court expressly held that the jury instruction correctly set forth state law, . . . and we have repeatedly held that 'it is not the province of a federal habeas court to re-examine state-court determinations on state-law questions.'" (quoting *McGuire*, 502 U.S. at 67-68)).

## V.  CONCLUSION AND ORDER

Benson is not entitled to relief on any ground raised in his Petition.

**IT IS THEREFORE ORDERED THAT** the Petition under 28 U.S.C. § 2254 for a Writ

of Habeas Corpus is **DENIED**.

**IT IS FURTHER ORDERED THAT** the Court declines to issue a Certificate of

Appealability.[62]  Any further request for a Certificate of Appealability must be addressed to the

Court of Appeals.[63]

The Clerk of the Court is to enter judgment accordingly.

Dated:  October 19, 2012.

_/s/ James K. Singleton, Jr._
JAMES K. SINGLETON, JR.
United States District Judge

---

[62] 28 U.S.C. § 2253(c); _Banks v. Dretke_, 540 U.S. 668, 705 (2004) ("To obtain a certificate of appealability a prisoner must 'demonstrat[e] that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.'" (quoting _Miller-El v. Cockrell_, 537 U.S. 322, 327 (2003))).

[63] _See_ Fed. R. App. P. 22(b); Ninth Circuit R. 22-1.